```
           IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF VIRGINIA

                     Alexandria Division

EYETICKET CORPORATION,       )
                             )
     Plaintiff,              )
                             )
          v.                 )    1:00cv669(JCC)
                             )
IRIDIAN TECHNOLOGIES, INC.,  )
                             )
     Defendant.              )
```

## **M E M O R A N D U M   O P I N I O N**

This matter is before the Court on Plaintiff EyeTicket Corporations's ("EyeTicket") motion to find Defendant Iridian Technologies, Inc. ("Iridian") in civil contempt of the Consent Order entered on September 19, 2000. Plaintiff seeks injunctive relief to compel Defendant to cure the alleged breaches of the Settlement Agreement, in addition to attorneys fees. For the reasons stated below, the Court will deny Plaintiff EyeTicket's motion for civil contempt.

### **I. Background**

Iridian[1] is a corporation that owns and licenses intellectual property related to iris recognition technology.

---

[1] Iridian Corporation was formerly named IriScan Corporation. For clarity, this memorandum opinion will exclusively use the name Iridian to refer to this corporation and IriScan Corporation.

EyeTicket[2] is a company that develops commercial applications of iris recognition technology that specifically targets high-volume markets, such as airports. In March 1999, the parties entered into a license agreement granting EyeTicket exclusive rights to use the Iridian technology in two "Fields of Use" and establishing a royalty payment structure based on gross equipment sales and gross fees for service.

In April 2000, EyeTicket filed a lawsuit claiming, *inter alia*, breach of contract, breach of fiduciary duty, and violation of antitrust laws. The parties reached an agreement to settle on September 19, 2000. The provisions of the Settlement Agreement required, among other things, a complete replacement of the royalty structure. Both EyeTicket and Iridian assert that the new pricing scheme embodied in the Settlement Agreement was critical in the decision to accept the settlement.

The agreement regarding software licensing fees, found in Part 2 of Schedule I to Exhibit B of the Settlement Agreement, gave EyeTicket the right to elect from four options. The first of these options allows EyeTicket to pay a one-time fee based on the number of camera stations deployed for a project. EyeTicket asserts that this particular option was uniquely attractive to it because of its cost-efficiency in high-volume processing markets.

---

[2]EyeTicket Corporation was formerly named Spring Technologies, Inc. For clarity, this memorandum opinion will exclusively use the name EyeTicket to refer to this corporation and Spring Technologies, Inc.

In addition to the four options, the Settlement Agreement had the following provision in regards to licensing:

> These fees charged to EyeTicket shall be at a most favored rate to resellers...and shall replace all running royalties payable to EyeTicket...under the License Agreement eliminated hereunder. The software fees will conform to [Iridian's] standard pricing schedule for software used in all iris recognition products manufactured and sold as described in Schedule I attached to this Exhibit B, as such Schedule I may be amended from time-to-time by [Iridian] at its discretion.

(Smith Decl. at Exh. B).  Iridian cites the pricing flexibility in the last clause of the above provision as a critical feature of the deal, especially given the long-term relationship it envisioned between the parties.

In December 2000, EyeTicket filed a motion for the Court to find Iridian in civil contempt of the same Consent Order in question in the present motion.  The motion was based on an alleged breach of EyeTicket's exclusive license to market to a particular industry.  The motion was denied by this Court in an Order filed on January 11, 2001.

Beginning in 2002, Iridian claims it modified its standard pricing for all of its licensees as a result of a change in the use of its technology to serve higher volumes of users.  Similarly, Iridian introduced new software to its licensees and phased out the old software that EyeTicket had been using.  Iridian claims that a letter was sent to the then-President of

EyeTicket in February, 2002, explaining this transfer to the new software.  The letter mentioned that Iridian would support the old software pursuant to the provision in the Settlement Agreement requiring six months notice prior to any software phase-out.  This letter also mentioned the new pricing scheme.  Disagreement ensued in mid-2002 regarding the pricing scheme.  EyeTicket allegedly had zero sales in all four quarters of 2002.

There was little communication between the parties from mid-2002 to mid-2004 at which point the disagreement regarding the pricing scheme continued and EyeTicket notified Iridian of the same three areas in which they believed Iridian breached the Settlement Agreement as are at issue in the present Motion.  The parties also had conversations during this time regarding EyeTicket's removal from Iridian's website as a listed partner.  EyeTicket asserts that Iridian provided EyeTicket with a number of different responses for why EyeTicket's name was removed from the website.

On July 15, 2005, EyeTicket filed a motion for civil contempt against Iridian for violating the September 19, 2000 Consent Order.  EyeTicket asserts that Iridian violated the Settlement Agreement in three ways: 1) Iridian removed EyeTicket's name from Iridian's website in violation of Paragraph 7 of the Settlement Agreement, requiring Iridian to "provide EyeTicket with the same access to customers and licenses [sic] of

biometric industry activities and standards development that other [Iridian] resellers receive;" 2) Iridian's change in the royalty structure violates the contractual duty of good faith and fair dealing;[3] and 3) Iridian failed to provide EyeTicket with six months notice before discontinuing any software in violation of Paragraph 7.  This Motion is currently before the Court.

## II. Standard of Review

To hold a party in civil contempt, the following four elements must be established by clear and convincing evidence:

> (1) the existence of a valid decree of which the alleged contemnor had actual or constructive knowledge; (2) . . . that the decree was in the movant's "favor"; (3) . . . that the alleged contemnor by its conduct violated the terms of the decree, and had knowledge (at least constructive knowledge) of such violation; and (4) . . . that [the] movant suffered harm as a result.

*Ashcraft v. Conoco, Inc*, 218 F.3d 288, 301 (4th Cir. 2000) (citing *Colonial Williamsburg Found. v. The Kittinger Co.*, 792 F. Supp. 1397, 1405-06 (E.D. Va. 1992), *aff'd*, 38 F.3d 133, 136 (4th Cir. 1994)).  A court may "impose sanctions for civil contempt 'to coerce obedience to a court order or to compensate the complainant for losses sustained as a result of the contumacy.'"  *In re General Motors Corp.*, 61 F.3d 256, 258 (4th

---

[3] The requirement of good faith and fair dealing stems from the parties' selection to have New Jersey substantive law govern the Settlement Agreement. There is no dispute between the parties that under New Jersey law every party to a contract is bound by an implied covenant of good faith and fair dealing.

-5-

Cir. 1995)(quoting *Connolly v. J.T. Ventures*, 851 F.2d 930, 932 (7th Cir. 1988) and citing *United States v. United Mine Workers of America*, 330 U.S. 258, 303-04 (1947)).

Although courts have broad discretion in fashioning remedies for civil contempt, which include "ordering the contemnor to reimburse the complainant for losses sustained and for reasonable attorney's fees," remedies and sanctions must be limited to either a remedial or compensatory purpose. *Id.* at 259; *see also Carbon Fuel Co. v. United Mine Workers of America*, 517 F.2d 1348, 1349 (4th Cir. 1975)(explaining that "[c]ivil contempt . . . is 'wholly remedial[,]' serves only the purpose of a party litigant, and is intended to coerce compliance with an order of the court or to compensate for losses or damages caused by noncompliance")(citations omitted).

### III. Analysis

The Plaintiff easily meets the first element of the four-part *Ashcraft* test. Undeniably, a valid decree exists of which the alleged contemnor has actual or constructive knowledge. The Consent Order, entered by Judge Hilton on September 19, 2000, classifies as a valid decree. Iridian clearly had actual knowledge of its entry, and Iridian executives signed the attached Settlement Agreement.

Likewise, the relevant portions of the decree are in the movant's - EyeTicket's - favor, satisfying the second

element of this four-part test.  Settlement agreements are compromises by their very nature.  Therefore, in the civil contempt arena, it is unlikely that the court is required to find that the settlement agreement in its entirety is in movant's favor.  Rather, only the portions of the agreement that the movant claims were breached need be in the movant's favor to satisfy this element of the test. *See Roadtechs, Inc. v. MJ Highway Tech.*, 83 F. Supp. 2d 677, 685-86 (E.D. Va. 2000)(citing only the particular provisions of the consent order that movant claimed were breached as in movant's favor).

The revised royalty structure allowed EyeTicket to choose its payment scheme among options.  The first among these options, the per-server option, was attractive to EyeTicket due to EyeTicket's interest in high-volume markets.  Thus, this provision was in EyeTicket's favor.

Similarly, Paragraph 7 of the agreement was in EyeTicket's favor.  This provision required Iridian to provide EyeTicket with the same access to customers and licensees as other resellers receive.  It also required Iridian to provide EyeTicket with product upgrades and support.  This paragraph clearly was for the benefit of EyeTicket.  Therefore, the second element of the *Ashcraft* test is satisfied.

The third element of the *Ashcraft* test requires a showing that Iridian knowingly violated the Consent Order.  Like

all elements of this test, EyeTicket must prove this element by clear and convincing evidence.

Firstly, EyeTicket has not shown by clear and convincing evidence that Iridian's removal of EyeTicket's name from Iridian's website violated the Settlement Agreement as a failure to provide EyeTicket with the same access to the biometric market as other resellers received.  The language of the Settlement Agreement makes no mention of a website or Internet postings.  EyeTicket cannot rely on the broad "same access" provision to support its claim that the very specific act of removing a name off a website qualifies as a breach of the agreement - especially without evidence that there was a meeting of the minds that postings would satisfy this provision.

Moreover, Iridian alleges that EyeTicket was removed from the website because of the inactivity of EyeTicket as a partner.  Although EyeTicket disputes its level of activity, EyeTicket proved zero sales in 2002.  Iridian claims to have followed the same procedure of removing names of other low-selling partners, thus treating EyeTicket similarly as other resellers.  This behavior does not rise to the level of contempt.

Secondly, EyeTicket failed to provide clear and convincing evidence of a breach of the implied covenant of good faith and fair dealing with respect to Iridian's actions

involving the revised royalty structure.  The provision in the Settlement Agreement that allows Iridian to amend the pricing scheme from time-to-time is of vital importance.  The agreement clearly states that "Schedule I may be amended from time-to-time by [Iridian] at its discretion." (Smith Dec. at Exh. B).  This provision clearly allows Iridian to modify its fees to adjust to evolving circumstances in the economic market, generally, and the iris recognition market, specifically.

     Not only does this language quite clearly dismiss EyeTicket's claim, but EyeTicket has also failed to prove the additional requirements of arbitrary treatment and bad faith. To support a good faith and fair dealing violation, EyeTicket must prove that Iridian exercised its discretion "arbitrarily, unreasonably, or capriciously." *Wilson v. Ameranda Hess Corp.*, 168 N.J. 236, 251 (2001).  Additionally, "an allegation of bad faith or unfair dealing should not be permitted to be advanced in the abstract and absent improper motive." *Id.*  EyeTicket is unable to prove arbitrary treatment and bad faith because the royalty structure to which EyeTicket objects is required of all Iridian's licensees.  EyeTicket is in no way being singled out or treated differently from all of Iridian's other partners.  The law is clear that "[w]ithout bad motive or intention, discretionary decisions that happen to result in economic disadvantage to the other party are of no legal significance."

*Id.*  EyeTicket's simple allegations of evasiveness do not satisfy a showing of bad faith, and therefore the economic consequences of this discretionary decision are afforded no legal significance and do not constitute contempt.

Thirdly, Plaintiff cannot prove by clear and convincing evidence that Iridian did not provide notification at least six months in advance of a phase out to old software.  In fact, in its reply, EyeTicket acknowledges a letter that notified EyeTicket of the six-month phase out.  (Pl.'s Reply p. 17.)  EyeTicket complains that the letter was sent to EyeTicket's then-CEO rather than to a specific individual and counsel as required in the Settlement Agreement.  Without refuting receipt of the letter, the failure to send the letter to the individuals specifically named in the Agreement does not rise to the level of contempt.

For each of its claims, EyeTicket has failed to show by clear and convincing evidence the third element of the *Ashcraft* test, a knowingly violation of the Consent Order.  Thus, EyeTicket has not met its burden for proving civil contempt on the part of Iridian.  A finding of contempt is largely reserved for clear, unambiguous violations. *See Omega World Travel, Inc. v. Omega Travel, Inc.*, 710 F.Supp. 169 (E.D.Va. 1989)(finding contempt when an advertisement plainly

violated the explicit language of a consent decree).  No such clarity is present in this case.

### IV. Conclusion

For the reasons stated above, the Court will deny Plaintiff's motion and not hold Defendant in civil contempt.  An appropriate Order will issue.

September 23, 2005            _____/s/_____
Alexandria, Virginia                James C. Cacheris
                              UNITED STATES DISTRICT COURT JUDGE